IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE DELBO, | ) | CASE NO.  1:21-CV-01522-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Michelle Delbo ("Plaintiff" or "Delbo"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").   This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.      PROCEDURAL HISTORY

In August 2013, Delbo filed applications for POD, DIB, and SSI, alleging a disability onset date of July 23, 2013 and claiming she was disabled due to bipolar disorder, depression, dysplasia, and severe arthritis in the left hip.  (Transcript ("Tr.") at 14, 95, 108, 123, 138.)  The applications were denied initially and upon reconsideration, and Delbo requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 14.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On November 24, 2015, an ALJ held a hearing, during which Delbo, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 2, 2016, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 14-33.)  The ALJ' s decision became final on October 6, 2016, when the Appeals Council declined further review.  (*Id.* at 1-6.)

Delbo appealed her claim to this Court, which remanded the case on June 15, 2017 on a joint stipulation of the parties.  (*Id.* at 897-98.)

After this Court's remand, the Appeals Court ordered remand.  (*Id.* at 903-07.)

Delbo's claims were then assigned to a new ALJ, who heard the remanded applications on April 6, 2018.  (*Id.* at 779.)   The new ALJ issued an unfavorable disability determination on August 1, 2018.  (*Id.* at 946-56.)

Delbo appealed the new denial to the Appeals Council, which remanded the claims on January 15, 2020.  (*Id.* at 969-71.)

Delbo's third disability hearing was held before the ALJ on July 8, 2020.  (*Id.* at 746.)  On July 28, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 715-32.)  The ALJ' s decision became final on June 5, 2021, when the Appeals Council declined further review.  (*Id.* at 686-92.)

On August 5, 2021, Delbo filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)   The parties have completed briefing in this case.  (Doc. Nos. 8, 12.)   Delbo asserts the following assignments of error:

(1)  The ALJ erred when she found that the claimant's intellectual disorder did not constitute a severe impairment.

(2)  The ALJ violated the treating physician rule.

(Doc. No. 8.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Delbo was born in July 1983 and was 37 years-old at the time of her third administrative hearing (Tr. 715, 731), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 731.)   She has past relevant work as a: cleaner, hospital; dishwasher, kitchen helper; cleaner, housekeeping; and child day care center worker.  (*Id.* at 730.)

### B.    Relevant Medical Evidence[2]

Delbo began receiving mental health treatment at Ravenwood Mental Health Center in 2009.  (Tr. 320.)

On September 10, 2013, Delbo met with Kristin Bischoff, B.A., M.A., QMHS, and reported she had started a new part-time position, had just gotten off work, and was tired.  (*Id.* at 376.)  Delbo told Bischoff her job was physically stressful.  (*Id.*)  Delbo wanted to start seeing a counselor again.  (*Id.*)  Delbo rated how she was doing on a scale of 1-10 as a 5.  (*Id.*)

On November 5, 2013, Delbo saw Audrey Heinen, ISW-S, for counseling.  (*Id.* at 494-95.)  Delbo reported she had been fired from McDonald's and was looking for a new job.  (*Id.* at 494.)  Delbo told Heinen she had a depressed mood.  (*Id.*)   Delbo rated how she was doing on a scale of 1-10 as a 5.  (*Id.* at 495.)

Later that month, Delbo began receiving job services through Ravenwood.  (*Id.* at 496.)

On December 2, 2013, Delbo saw Bischoff for follow up.  (*Id.* at 497.)  Delbo reported having taken a trip to Chicago with her boyfriend.  (*Id.*)  Delbo told Bischoff she was starting a temp job in a few

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  As Delbo only challenges the ALJ's findings relating to her mental impairments, the Court further limits its discussion of the medical evidence accordingly.

days and that she was looking forward to working again.  (*Id.*)  Bischoff noted Delbo appeared in a good mood.  (*Id.*)  Delbo rated how she was doing on a scale of 1-10 as a 5.  (*Id.*)

On December 30, 2013, Delbo saw Dr. Herschel Pickholtz for a consultative psychological examination.  (*Id.* at 450-56.)  Delbo reported she could not work because of left hip problems and arthritis.  (*Id.* at 451.)  Delbo received counseling at Ravenwood but was not taking medication.  (*Id.* at 451-52.)  Without medication, she experienced mild affective symptoms, including depression.  (*Id.* at 452.)  Delbo reported doing "okay" with her counseling.  (*Id.*)  Delbo relayed a history of special education classes through graduation and passing the OGT.  (*Id.*)  Delbo never received disciplinary action at work and could have stayed at her cleaning job if not for her hip.  (*Id.*)  Delbo told Dr. Pickholtz she was able to fill out work applications independently.  (*Id.* at 453.)

On examination, Dr. Pickholtz found appropriate eye contact, a slightly constricted and depressed mood, and full facial expressions.  (*Id.*)  Dr. Pickholtz noted Delbo spoke a "little unclearly" and did not always articulate effectively, with intelligibility at about 80%.  (*Id.*)  In terms of cognitive functioning, Dr. Pickholtz determined Delbo's ability to recall long-term history, recall objects after a slight delay, overall levels of intellectual functioning, arithmetical capacities, capacity to define words, capacity for abstract thinking, capacity to interpret common proverbs, and capacity to perform serial 7s all fell within the borderline range.  (*Id.* at 454.)  Delbo's ability to recall a sequence of numbers fell within the low average range.  (*Id.*)  Dr. Pickholtz determined:

> Based upon the responses to these operations and the descriptions of her daily living activities, her estimated levels of intelligence fell within the at least borderline range.  There was a mild discrepancy between the responses to the evaluation and the quality and quantity of her daily living activities and pre morbid levels of intellectual functioning in accordance with prior levels of alleged DH placement and passing the OGT and levels of independence and social adaptation, which were inconsistent with true retardation.

(*Id.*)  Dr. Pickholtz further determined Delbo's abilities to understand and remember written materials fell within the negligible range of impairment.  (*Id.* at 455.)  Dr. Pickholtz diagnosed Delbo with an

4

unspecified depressive disorder and a speech sound disorder. (*Id.* at 456.) Dr. Pickholtz opined, "The impact of her current psychiatric complaints relative to work functioning for unskilled labor did not reflect any serious impairment and falls within the slight range of impairment at worst." (*Id.* at 455.)

On July 10, 2014, Delbo saw James Rodio, M.D., for medication management. (*Id.* at 579-80.) Delbo complained of depression, including moodiness, crying, irritability, and insomnia. (*Id.* at 579.) Delbo reported she pretty much just sat at home and had an erratic sleep schedule with intermittent day time napping. (*Id.*) Delbo told Dr. Rodio she had been in special education classes but could be a good hands-on learner. (*Id.*) Delbo described herself as "'more street smart than book smart.'" (*Id.*) Delbo reported a history of temporary jobs in retail that ended as a result of coworker conflict and tardiness, work at a hospital kitchen that resulted in termination for tardiness and conflict with her boss, cleaning/maintenance at the Common Pleas Court, and cleaning Dog Warden cages. (*Id.*) On examination, Dr. Rodio found speech that was "a little thick sounding," linear thought process, full orientation, recall of 3/3 items, no involuntary movements, and uncertainty of the meaning of a basic proverb. (*Id.*) Delbo declined to attempt to say the months of the year backward, telling Dr. Rodio she could say them forward but not backward. (*Id.*) Dr. Rodio started Delbo on Zoloft. (*Id.*)

On August 20, 2014, Delbo saw Dr. Rodio for follow up and reported taking her medication. (*Id.* at 581.) Delbo suggested her medication made her less argumentative, although she still had "'spats,'" but it made her tired. (*Id.*) Dr. Rodio noted Delbo was 25 minutes late for her appointment and arrived with disability paperwork. (*Id.*) On examination, Dr. Rodio found speech that was "a little thick sounding" and basic/linear thought process with no psychosis. (*Id.*) Delvo reported feeling "'pretty good'" and that things had been "'pretty smooth.'" (*Id.*)

Delbo continued to see Dr. Rodio for the remainder of 2014 and into 2015. (*Id.* at 584-88.) Dr. Rodio noted some inconsistency with medication compliance. (*Id.*)

On July 21, 2015, Dr. Rodio completed a medical source statement regarding Delbo's mental capacity.  (*Id.* at 539-40.)  Dr. Rodio opined Delbo could rarely maintain attention and concentration for extended periods of two-hour segments, interact with supervisors, function independently without redirection, work in coordination with or proximity to others without being distracted, deal with work stress, understand, remember, and carry out complex job instructions, understand, remember, and carry out detailed but not complex job instructions, and manage funds/schedules.  (*Id.*)  Dr. Rodio based his opinions on Delbo's "history of depression and intellectual limitations which handicap her assessment and handling of situations."  (*Id.* at 540.)

As of September 9, 2015, Delbo's diagnoses by Dr. Rodio consisted of depressive disorder, not otherwise specified, and mental retardation, severity unspecified.  (*Id.* at 599-600.)

On October 15, 2015, the Geauga County Board of Developmental Disabilities informed Delbo she qualified for services through them.  (*Id.* at 543.)   Based on the OEDI, Delbo showed "substantial functional limitations" in the areas of mobility, self-care, self-direction, and economic self-sufficiency.  (*Id.* at 543-44.)  The Form for Eligibility Determination referred to a finding of intellectual disability by Larry R. Killian, Ph.D., following a psychological evaluation on July 29, 2015.  (*Id.* at 544.)

Delbo continued to receive mental health treatment at Ravenwood into 2016.  (*Id.* at 1236-1256, 1331-1336.)  Delbo's only diagnosis during this time was major depressive disorder.  (*Id.*)

On November 1, 2016, Delbo underwent a mental health assessment at Signature Health to transfer services from Ravenwood.  (*Id.* at 1340.)  Delbo reported a history of depression and anxiety, for which she was taking medication.  (*Id.*)  On examination, therapist Emily Company found good eye contact, although Delbo was distractible, pleasant and cooperative behavior, below average intellect, concrete thought processes, and limited insight.  (*Id.* at 1341.)  Company diagnosed Delbo with tobacco use disorder and anxiety state, unspecified.  (*Id.*)

Delbo continued to receive mental health treatment at Signature Health into 2017.  (*Id.* at 1357-58, 1535-39, 1565-69, 1580-81, 1601-06, 1866-69.)   Delbo also resumed mental health treatment at Ravenwood in 2017.  (*Id.* at 1759-60, 1764-69, 1779-83.)   A Ravenwood Crisis Intervention Progress Note from November 21, 2017, documented a phone call where Delbo called emergency services and reported she was thinking of committing suicide.  (*Id.* at 1779.)

On February 7, 2018, Kathleen Christy, APN, completed a medical source statement regarding Delbo's mental capacity.  (*Id.* at 1963-64.)  Christy opined Delbo had marked limitations in her abilities to handle conflicts with others, understand and respond to social cues (physical, verbal, emotional), respond to requests, suggestions, criticism, correction, and challenges, work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, work a full day without needing more than the allotted number or length of rest periods during the day, respond to demands, adapt to changes, and set realistic goals.  (*Id.*)  Christy based these limitations on Delbo's "PTSD, anger, anxiety, depression."  (*Id.* at 1964.)

On September 4, 2018, Delbo saw Katie Kajels, CT, and reported that while she felt down sometimes, "it ha[d] not affected much of her functioning."  (*Id.* at 2211.)  On examination, Kajels found a euthymic mood, full affect, logical thought process, cooperative behavior, and full orientation.  (*Id.* at 2216-17.)  Kajels diagnosed Delbo with adjustment disorder with mixed anxiety and depressed mood.  (*Id.* at 2219.)

Delbo continued to receive mental health treatment at Signature Health and Ravenwood in 2018 and 2019.  (*Id.* at 1870-74, 1875-80, 1968-69, 1982-87, 2009-11, 2134-39, 2155-59, 2202-04, 2243-44.)

Delbo continued receiving mental health treatment at Signature Health and Ravenwood in 2020.  (*Id.* at 2013-21, 2033-34, 2256-58, 2276-78, 2310-16.)

C.     **State Agency Reports**

On January 20, 2014, Robyn Hoffman, Ph.D., reviewed Delbo's file and opined she had mild limitation in activities of daily living and maintaining social functioning and moderate limitations in maintaining concentration, persistence, or pace. (*Id.* at 100-01, 113-14.) Dr. Hoffman opined Delbo would be limited to 1-2 step tasks in a routine work environment and would be limited to a static environment without strict time demands and where any changes in routine could be readily explained. (*Id.* at 103-05, 117-18.)

On June 1, 2014, Roseann Umana, Ph.D., affirmed Dr. Hoffman's findings regarding Delbo's limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (*Id.* at 129, 144.) Dr. Umana opined Delbo would be limited to 1-3 step tasks in a routine work environment, could attend and complete simple routine tasks, could communicate with others and be around others, could perform work with regular supervision and minimal to moderate contact with others, and would be limited to a static environment without strict time demands and where any changes in routine would be infrequent and readily explained. (*Id.* at 132-134, 147-49.)

D.     **Hearing Testimony**

During the July 8, 2020 hearing, Delbo testified to the following:

- She lives in an apartment by herself with a cat and a therapy dog. (*Id.* at 753.) She has a driver's license and drives. (*Id.* at 754.) She has not worked or done volunteer work since her last hearing. (*Id.* at 755.)

- Her mental health issues have gotten worse since her last hearing. (*Id.* at 760.) She does not feel like getting out of bed at times. (*Id.*)

- She does her own shopping. (*Id.* at 763.) She prepares her own meals, although it is microwave items of quick food on the stove. (*Id.* at 763-64.) She uses a motorized cart at the store. (*Id.* at 770.)

- On a typical day, she hears her dog get up and she will take her dog outside. (*Id.* at 764.) She changes the potty pads on the floor. (*Id.*) She sits at home or goes next door to talk to her neighbor. (*Id.* at 765.) Sometimes she goes with her neighbor to concerts in the park or they go to the beach. (*Id.*) She cannot do much because she

8

has no money.  (*Id.*)  Sometimes she will visit her friend who has a horse and will pet the horse and hold the lead rope.  (*Id.* at 768.)  When she is home, she spends the majority of the day in bed.  (*Id.* at 770.)

- She went to visit a friend in Pennsylvania for a weekend, but she ended up getting sick and staying in bed.  (*Id.* at 766.)

- When she is overwhelmed, she feels like she has a lump in her stomach and like she cannot breathe or think.  (*Id.* at 770-71.)  If someone says the wrong thing to her, she flies off the handle.  (*Id.* at 771.)  She has those feelings every day.  (*Id.*)

The ALJ relied on the previous findings regarding past work.  (*Id.* at 756.)  The ALJ then posed the following hypothetical question:

> So with that in mind, Mr. Pruitt, I'm going to ask if you could please assume an individual claimant's age, education, and work experience.  And if you can please assume that this hypothetical individual can lift and carry, push and pull occasionally 20 pounds, frequently 10 pounds; stand and/or walk for two hours of an eight-hour workday; sit for six hours out of a [sic] eight-hour workday; [o]ccasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, crouch, and crawl.  This individual can be frequently exposed to fumes, odors, gas, and poor ventilation; never be exposed to hazards of unprotected heights and dangerous machinery.  This individual is further limited to perform simple routine tasks, but not at a production-rate pace; have occasional interactions with supervisors, coworkers, and the public; [a]nd is also limited to occasional routine workplace changes.  With these limitations can you please advise would such an individual be able to perform claimant's past work?

(*Id.* at 773.)

The VE testified the hypothetical individual would not be able to perform Delbo's past work as a cleaner, hospital; dishwasher, kitchen helper; cleaner, housekeeping; and child day care center worker. (*Id.*)  The VE further testified the standing/walking limitation would limit the hypothetical worker to sedentary work.  (*Id.*)  In response to the ALJ's question whether there would sedentary jobs such an individual could perform, the VE testified such an individual could perform representative jobs in the economy, such as film touch-up inspector, table worker, and gauger.  (*Id.* at 773-74.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.

*See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Delbo was insured on her alleged disability onset date, July 23, 2013, and remained insured through September 30, 2017, her date last insured ("DLI").  (Tr. 716.)  Therefore, in order to be entitled to POD and DIB, Delbo must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2017.

2.  The claimant has not engaged in substantial gainful activity since July 23, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: major joint dysfunction; obesity; depressive, bipolar, and related disorders; and anxiety and obsessive-compulsive disorders (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  She can tolerate frequent exposure to fumes, odors, dusts, gases, and poor ventilation.  She must avoid

exposure to hazards, such as unprotected heights and dangerous machinery.  She is limited to simple, routine tasks that are not performed at a production rate pave [sic].  She could occasionally interact with supervisors, co-workers, and the public and can tolerate occasional changes in a routine workplace.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on July **, 1983 and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from July 23, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 718-32.)

## V.      STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).   Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.").  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and

logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Step Two

In her first assignment of error, Delbo asserts the ALJ erred in finding her intellectual disorder was not a severe impairment at Step Two.  (Doc. No. 8 at 15.)

The Commissioner argues substantial evidence supports the ALJ's Step Two finding, and the ALJ considered Delbo's intellectual functioning in the RFC analysis.  (Doc. No. 12 at 7-10.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques.  *See* 20 CFR §§ 404.1521, 416.921; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996).  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  *Id.*

"[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone."  *Id.*  Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or

14

mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96–4p (footnote omitted). *See also* 20 C.F.R. §§ 404.1529(b), 416.929(b) ("Your symptoms . . . will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."). *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017). The claimant bears the burden of establishing the existence of a medically determinable impairment. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require."). *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ." 20 CFR §§ 404.1520(c), 416.920(c). "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1522(b), 416.922(b). Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding

appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*.

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id*.  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 577 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the

remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant." *Anthony*, 266 F. App'x at 457.

At Step Two, the ALJ found several mental and physical impairments severe but found as follows with respect to an intellectual disorder:

> Additionally, the undersigned notes that Larry Killian, Ph.D., indicated that the claimant had been diagnosed with intellectual disorder (15F/2). However, this diagnosis was not supported with diagnostic intelligence testing showing full-scale IQ scores within the intellectual disability range. Additionally, while providers below found the claimant exhibited good recent and remote memory, logical thought processes, normal thought content, logical associations, and average estimated intelligence. Such evidence does not establish intellectual disability as a medically determinable impairment in this matter.

(Tr. 718-19.)  In the RFC analysis, the ALJ considered the impacts of Delbo's intellectual functioning. (*Id.* at 723-30.)

The ALJ considered Delbo's impairments, severe and non-severe, in the RFC analysis.  There is no error.

## B.    Treating Physician Rule

In her second assignment of error, Delbo asserts the ALJ erred in assigning little weight to the opinions of treating psychiatrist Dr. Rodio and treating CNP Christy.  (Doc. No. 8 at 19.)  Delbo argues the ALJ "cherry-picked" the record to find support for her conclusion that Delbo's mental impairments were not disabling, and that these providers' opinions should have been given controlling weight as no report of any other treating physician contradicted their opinions.  (*Id.* at 20.)

The Commissioner responds that the ALJ "reasonably afforded little weight" to Dr. Rodio's unsupported checkbox opinion and "sufficiently articulated her rationale for doing so."  (Doc. No. 12 at 11-12.)  With respect to Nurse Christy, the Commissioner asserts she was not an "acceptable medical source" under the applicable regulations and therefore the ALJ was not required to articulate good reasons

17

for rejecting her opinion.  (*Id.* at 15.)  Nonetheless, the ALJ evaluated Nurse Christy's opinion and "provided a reasonable basis for discounting" her opinion.  (*Id.*)

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c),[3] and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)."  *Id.*  In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."  Social Security Ruling ("SSR") 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).[4]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart,* 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected."  *Blakley v. Comm'r of Soc. Sec.*,

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[4] SSR 96-6p was rescinded and replaced by SSR 17-2p, effective March 27, 2017.  *See* SSA 17-2p, 2017 WL 3928306, at *1 (SSA Mar. 27, 2017).

581 F.3d 399 (6th Cir. 2009) (quoting SSR 96-2p, 1996 WL 374188, at *4 (SSA July 2, 1996)).[5]  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188, at *5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*,

---

[5] SSR 96-2p has been rescinded.  This rescission is effective for claims filed on or after March 27, 2017.  *See* SSR 96-2p, 2017 WL 3928298, at *1.

[6] Pursuant to 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[7]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

### 1. Dr. Rodio

The ALJ weighed the opinion of Dr. Rodio as follows:

---

[7] "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id*. § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

> In addition, the undersigned finds that James Rodio, M.D., opined the claimant could occasionally-to-rarely perform mental work activities. However, Dr. Rodio did find the claimant could frequently socialize and maintain appearances. The undersigned notes that Dr. Rodio did not cite to objective evidence supporting the significant degree of limitations opined. Rather, Dr. Rodio noted the claimant had a history of depression and intellectual limitations (13F). Additionally, the undersigned finds this opinion is inconsistent with the longitudinal record of evidence, which supports the finding of no more than moderate limitations in mental functioning. Evidence supporting less restrictive mental limitations includes the abovementioned optimal mental status examination findings showing the claimant was alert, oriented, well groomed, and exhibited an average demeanor, good hygiene, average eye contact, clear speech, no delusions or hallucinations, logical thought processes, good recent and remote memory, normal attention and concentration, a euthymic mood with full affect, the ability to abstract, intact judgment and insight, normal thought content, logical associations, and average intelligence. Accordingly, this opinion is assigned little weight.

(Tr. 728.)

While the ALJ failed to recognize Dr. Rodio as a treating source, Delbo fails to assert this failure as a ground for error.  (Doc. No. 8.)[8]

Dr. Rodio's opinion was a check-box form that, as the ALJ noted, lacked any reference to specific treatment notes, diagnostic testing, or other objective findings to support the limitations set forth in the opinions.  The Sixth Circuit has discounted "check-box analysis" as "weak evidence at best," particularly when it is not accompanied by any supportive findings or records.  *See Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 441 (6th Cir. 2017); *see also Hernandez v. Comm'r of Soc. Sec.,* 644 F. App'x 468, 474-475 (6th Cir. 2016); *Ellars v. Comm'r of Soc. Sec.,* 647 F. App'x 563, 566 (6th Cir. 2016)("Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that 'did not cite clinical test results, observations, or other objective findings . . . '").  While Delbo points to medical evidence she argues supports Dr. Rodio's opinion, Dr. Rodio did not do so.  *See Price v. Comm'r of Soc.*

---

[8] For the reasons discussed *infra*, as the ALJ complied with the treating source rule in discounting Dr. Rodio's opinion, there is no harmful error necessitating remand.  *See, e.g., Martin v. Comm'r of Soc. Sec.,* 658 F. App'x 255, 257-58 (6th Cir. 2016).

*Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding Price's impairments, the ALJ did not err in discounting his opinion.") (citations omitted).  *See also Buxton*, 246 F.3d at 773 ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'") (citation omitted).

The ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  The ALJ determined that Dr. Rodio's opinion was inconsistent with other objective evidence in the record, citing specific examples.  (*Id.* at 728.)  It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.

Although Delbo cites evidence from the record she believes supports a more restrictive RFC, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton*, 246 F.3d at 772-73.  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

There is no error in the ALJ's evaluation of Dr. Rodio's opinion.

### 2.  Nurse Christy

The ALJ weighed Nurse Christy's opinion as follows:

> Additionally, Kathleen Christy, A.P.R.N., a non-acceptable medical source, provided a mental capacity evaluation in this matter. In her evaluation, she found the claimant had mild-to- moderate limitations in understanding, remembering, or applying information and moderate-to- marked limitations in the remaining paragraph B domains. However, the undersigned finds that this evaluation did not contain citations to objective findings supporting the degree of limitations opined. Rather, the evaluation cited to a history of post-traumatic stress disorder, anger, anxiety, and depression (48F). Additionally, the undersigned finds this opinion is inconsistent with the record of evidence, which supports no more than moderate limitations in mental functioning. Evidence supporting less restrictive mental

limitations includes the abovementioned optimal mental status examination findings showing the claimant was alert, oriented, well groomed, and exhibited an average demeanor, good hygiene, average eye contact, clear speech, no delusions or hallucinations, logical thought processes, good recent and remote memory, normal attention and concentration, a euthymic mood with full affect, the ability to abstract, intact judgment and insight, normal thought content, and average intelligence. Accordingly, the undersigned assigns little weight to this opinion.

(Tr. 729-30.)

As the ALJ explained, Nurse Christy was not an acceptable medical source and therefore could not be considered a treating source whose opinion was entitled to controlling weight under the regulations.  20 C.F.R. §§ 404.1502, 404.1527, 416.902, 416.927.

Again, the ALJ considered and weighed the medical opinion evidence of record and provided an explanation for the weight assigned.  It is the ALJ's duty, not this Court's, to weigh the evidence and resolve any conflicts, and she did so here.  The fact that Delbo would weigh the evidence differently or that there is record evidence that may support a more restrictive RFC do not serve as grounds for reversal.

There is no error.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: July 7, 2022                               *s/ Jonathan Greenberg*
                                                 Jonathan D. Greenberg
                                                 United States Magistrate Judge